FARRIS & COMPANY, a corporation, *Plaintiff in Error*, v. JOHN COLLIER, *Defendant in Error*.

136 So. 510.

En Banc.

Opinion filed August 10, 1931.

Petition for rehearing denied September 19, 1931.

*Martin H. Long,* for Plaintiff in Error;
*Milam, McIlvaine & Milam,* for Defendant in Error.

BUFORD, C.J.—In this case the plaintiff in error states that there are two questions involved. The first is:

"Do the words 'approximately five thousand head of cattle' as used in a written contract of purchase and sale, entitle the seller to deliver only 4134 head of cattle and as matter of law, absolve the seller from responsibility when sued, for his failure to deliver the difference unless the purchaser alleges and proves that the seller had in stock a sufficient number of head of cattle of the type contracted for from which deliveries could have been made, to complete the delivery of the balance or difference between 4134 delivered and the 5,000 head contracted for?"

The second question is:

"If a purchase and sale contract is entered into for the sale and delivery of all cattle on a range, of a certain specified mark and brand, does the title to calves that were the issue of the group of cattle so marked and branded and born subsequent to the entering into be-

tween the parties, of the purchase and sale agreement, remain in the seller?''

The case was tried upon the second amended declaration and certain pleas thereto, amongst which there was the 9th plea, which was as follows:

''And for a plea of set-off to the plaintiff's declaration, this defendant says that the plaintiff is indebted to this defendant in the sum of Five Thousand Seven Hundred Twenty ($5,720.00) Dollars arising out of the contract herein sued, because heretofore, to-wit, July 5th, 1929, this defendant delivered to said plaintiff four hundred thirty-six (436) head of cattle at Twenty ($20.00) Dollars per head, and whereby the plaintiff became indebted to this defendant in the sum of eighty-seven hundred twenty ($8720.00) Dollars therefor. That then and there the plaintiff took credit for the Three Thousand ($3,000) Dollars deposit made in 1929, leaving a balance due by the plaintiff to the defendant in the sum of Five Thousand Seven Hundred Twenty ($5,720.00) Dollars, which said sum the plaintiff has wholly neglected and refused to pay and for which said sum defendant is willing to set off against the sum claimed by the plaintiff, and prays judgment for any over-plus.''

The verdict was in favor of the defendant for the full amount claimed in his 9th plea and judgment was accordingly entered.

We find no good reason to enter into a discussion of the questions presented by the plaintiff in error further than to say that there appears to have been no reversible error committed by the trial court in its rulings in regard to these questions. The contract was executory. The purchaser agreed to buy and the vendor agreed to sell a certain herd of cattle under a certain mark and brand and the contract stated that the number of cattle in the herd was ''approximately'' 5000 head. The cattle were to be delivered f. o. b. on cars by the seller and the cattle delivered were to be paid for at the rate of $20.00 per head. The contract did not call for the delivery of 5000 head of cattle

but it did call for the delivery of the particular herd of the cattle under the mark and brand named and the evidence shows that this herd of cattle was delivered or accounted for. If the evidence had shown that the plaintiff in error went into the market and bought sufficient cattle to make up the shortage and was required to pay more than $20.00 per head for the same, or if the plaintiff in error had shown, or it had been made to appear by a preponderance of evidence that the plaintiff had sold or had contracted to sell the 5000 head of cattle at a profit, the question might be material as to whether or not under the contract the defendant in error was required to deliver 5000 head.

The declaration here bases the cause of action on the loss of profit to the plaintiff in error on 951 head of cattle, the difference between the purchase price and the value of the cattle, and also claims credit for 85 calves which the plaintiff claimed were issue of the herd of cattle born into the herd after the contract of sale.

The plaintiff could recover nothing upon the theory that he was entitled to damages for loss of profits because the preponderance of the evidence, if not the entire evidence, shows that there was no loss of profit, but on the contrary that the cattle were worth less than the plaintiff agreed to pay for them. The most favorable aspect from the viewpoint of plaintiff in error of the preponderance of evidence was that the cattle were not worth more than an average of $17.75 per head. The plaintiff's testimony shows that when the herd of cattle were purchased plaintiff expected to get a better grade of cattle than these turned out to be, in that it developed that there were not as many steers and bulls in the herd and there were more small cattle in the herd than purchaser thought were there at the time it bought. The plaintiff's main witness testified:

"This herd of cattle did not average up. I dont know that I could say just how many cows and steers we got; I couldn't say that off-handed, because I didnt count

them and would not want to say that, but I don't think we got twenty five per cent of the steers and bulls they claimed was in the stock. I would not say that this herd of cattle was twenty-five percent under the average of expectation. According to that, you see, if there was two thousand steers, two thousand beef in there, bulls and steers, I dont think we got over five hundred. That would leave seventy five per cent of the big cattle wasnt there. I dont know what percent you would figure that on the stock of cattle. I would say the percentage of this herd as a whole was short of what I expected seventy five per cent of the beef. The beef forms about two thousand out of five thousand head, that is not quite one-half of the cattle. I would say that it was short forty percent of what was claimed to be in there. If I were buying a herd of cattle down there at twenty dollars a head and it was short forty percent, that would only be worth twelve. I suppose that figures out something about right. It looks like we made a bad buy on these cattle. I suppose the way the stuff checked up short, I dont suppose they were worth over twelve dollars a head.''

The plaintiff must recover, if at all, upon the allegations of its declaration and as no loss of profits is shown by reason of the shortage in number the plaintiff can not recover for such loss.

Whether or not the plaintiff was entitled to credit for the 85 calves for which credit is claimed depends upon whether or not the cattle became the property of the plaintiff at the time of the execution of the contract or became the property of the plaintiff at delivery on cars. We concur in the construction of the Circuit Court as to this matter. If the cattle became the property of the plaintiff at the execution of the contract then the plaintiff would have been required to stand the loss in the case of death, or other destruction, of the cattle not attributable to the defendant. The contract itself provides:

''The seller agrees to deliver to the buyer all cattle marked crop split in one ear and bolt in the other ear branded 'X', under the following terms and conditions:

The seller agrees to deliver to the buyers on board the cars F. O. B. Zolfo Springs, Florida, approximately five thousand (5000) head of cattle at Twenty ($20.00) Dollars a head; these cattle shall be known as general range stock cattle. The start of delivery of these cattle to begin the week of October 8th, 1928, and the delivery shall continue until December 22nd, 1928, at approximately two hundred fifty (250) to six hundred (600) head a week. The balance of the delivery of these cattle to begin in March, 1929.

These cattle are to be paid for by the buyers when loaded on the cars at Zolfo Springs, Florida. The buyers agree to pay the seller five thousand dollars ($5,-000.00) in advance as a binder, this to be retained by the seller until the last shipment is made in December, 1928. Furthermore, the buyers agree to advance the seller two dollars ($2.00) a head for the balance of the cattle to be shipped in 1929.—this balance to be determined by the number shipped in 1928, deducted from five thousand (5000) head.''

The record shows that the construction placed on the contract by both the buyer and the seller was that title passed on delivery of the cattle on board cars at point of shipment. The buyer paid for all such cattle under this construction of the contract and when the last shipment was made the buyer gave its check for $5720.00 in final settlement for all cattle delivered, including the calves. Payment on the check was stopped but there appears to have been no claim made for calves until suit was brought. The testimony of Mr. Collier in regard to the closing incident was as follows:

''When I signed the contract, Mr. F. H. Williams, Mr. Farris and Mr. Barber and the cashier of the bank were present. Mr. F. H. Williams is the foreman in connection with these cattle. Mr. Farris at the time said that Mr. Barber would carry out the contract with me,—said we wouldnt see him any more down there; that Mr. Barber would represent everything—pay for the cattle and receive them on board. He said that Mr. Barber would represent everything from then on. I then dealt with Mr. Barber from that time. It is correct that I

delivered to these people 4134 head of cattle. When I got ready to make the last delivery, that was the 5th of July, I did not see Mr. Barber down there before the 5th. He was with the boys though cow hunting out on the range. The boys said that he had been out about a week. The boys rounded up the cattle at that time. They rounded up 436 head. When they came in I saw Mr. Barber about that time. I saw him the morning of July 5th. He came in ahead of the boys and I asked him what sort of a bunch of cattle he had, what kind of a drove, He said, 'a pretty fair drove',.—'Pretty nice cattle.' That was about all he said. The boys came in and we loaded the cattle and he called me 'Uncle John'. He said 'Uncle John, I think you have got about all of them.' I said, 'Well, there are some few scattered about.' 'Yes but', he said, 'It is worth them to get them', and he said 'I think we had better take the forfeit down and call it off'. I said 'Well, if that suits you, it is all right with me'. So he took the forfeit down. These cattle came to $8,720.00 and he asked me to terminate the contract and take down the $3,000.00 and we would call it off, so he then gave me a check for $5,720.00.''

There is no question but that the rule is as stated in R. C. L. Vol. 1, page 1070, as follows:

''In the absence of any agreement to the contrary the general rule is that the off-spring or increase of tame and domestic animals belongs to the owner of the dam or mother. In this respect the common law follows the civil and is founded on the maxim *partus sequitur ventrem*, which principle, according to Puffendorf, is based not alone on the fact that the male is frequently unknown, but also upon the circumstance that the dam, during the time of her pregnancy, is almost useless to the proprietor, and must be maintained with greater expense and care; wherefore, as her owner is the loser by her pregnancy, he ought to be the gainer by her brood.''

Therefore, as the buyer did not become the owner of the cattle until they were delivered on board cars at the point of shipment, and the seller remained owner of all cattle while they were on the range, and any loss of such cattle while on the range accrued to the seller, and not to the

buyer, the buyer did not become the owner of the calves until they were delivered on board the cars and its contract called for the payment of all cattle at $20.00 per head. The buyer so recognized the contract when through its agent who helped to gather the cattle from the range it gave its check for the full number of cattle, including calves.

We find no error in the judgment. It should be affirmed. It is so ordered.

Affirmed.

WHITFIELD, TERRELL, BROWN AND DAVIS, J.J., concur.